Please be seated. If counsel in our next case, Empower Oversight Whistleblowers v. National Institutes of Health will come on up. Mr. Bielert, did I get that right? Yes, Your Honor. All right. We'll be glad to hear from you. Good morning. May it please the Court. My name is Jeff Bielert. I'm here on behalf of Empower Oversight. This is a FOIA case. Empower filed three separate FOIA requests. In response to each one of those requests, it is undisputed in this case that the National Institutes of Health failed to abide by the statutory deadline either to issue a determination or to explain to Empower Oversight why unusual circumstances warranted extra time for the NIH to respond. In fact, the NIH essentially sat on its hands and did nothing until Empower Oversight filed this lawsuit. Even then, the suit was filed in November. The NIH still did not issue a determination as to these three FOIA requests. It took a month for one of the requests, and then for the others they were issued, the two others in February. Empower Oversight in this case argued below it had three different claims. The first claim was this violation of the statutory deadlines, which again is undisputed as a matter of fact that the agency did not issue the determination within the requisite time that it was required to do so. Empower brought that as a separate claim. Empower sought declaratory relief on that claim and argued that below. The reason why Empower brought that claim in the district court was because there are cases that recognize that a plaintiff in unique circumstances may get declaratory relief from a district court even on a FOIA claim. So you're basically arguing, I take it, that there's a standalone cause of action for late response. So there's two distinct deadlines, and I just want to be clear about this. The response that we're talking about is sort of this statutory obligation to have a determination made as to each one of the requests. That is the standalone claim that we're bringing. This is the 20 days? Twenty days or the 10 working days that they can get additional time. But they have to respond, right? The agency has an obligation to let the requester know what's going on. But so you are arguing in response to Judge Agee's question, you are arguing that there is a standalone claim for missing a statutory deadline? Yes. And what's your best authority for that? So, Your Honor, we cited in our brief there's a series of cases in both the D.C. Circuit and the Ninth Circuit as well. Counsel for the government acknowledges these cases. They're characterized as sort of a pattern or practice claim. Right. In this case . . . Well, you have an alleged pattern. That's correct, Your Honor. But there's no legal distinction between . . . And this is a case that we did cite coming out of California where the district court basically said that there's sort of two sorts of claims that you might be able to establish that would require the court to consider whether declaratory relief is appropriate. And one of those is when you're alleging sort of this pattern or practice. You're using the magic language pattern or practice. Okay. But you didn't allege that? No. That's not in our complaint. We don't dispute that. What we allege is there's a set of . . . And the reason is the theory of that kind of complaint, I think there's a D.C. Circuit opinion I read that says this, like I keep submitting FOIA requests. They keep missing deadlines. I intend to submit FOIA requests in the future. I have no reason to believe they won't. Based on the fact they've missed it every time in the past, I have every reason to believe they're going to miss it in the future. Please order them to not miss it in the future. That's the sort of essence of a pattern or practice claim? Yeah. So you could have an injunction or you could have a declaratory judgment. And then the . . . Oh, yeah. This is the D.C. Circuit case about like the presidential family's travel. Like every single time I submit to the Secret Service a FOIA request, they miss this deadline.  I'm going to keep submitting them. Please order them to not miss them again. Right. So there were, I think, five requests in that case. That was a judicial watch that was the case you're describing. What I'm talking about is there's a district court case like California. We said it in our briefs. There's also a set where there's a set of requests. Here we submitted three. There's no question that the NIH did not comply with the statute in response to any one of the three requests. What about we have a prior decision, which is regulated management corporation versus legal services, that says it is undisputed that a challenge to a particular denial of a FOIA request becomes moot if an agency produces the requested documents. And they produced a lot of documents. That's correct, Your Honor. So this is important, and this is a distinction that I think was missed on the district court. When you're talking about a promptness claim, so this is a separate statutory deadline, cases that are addressing promptness claims. Again, this is a different part of the statute. We're not talking about the 20 and 10-day deadlines. We're talking about the promptness of an agency's production of documents. That's a claim that is often raised in FOIA litigation, and it is true, and I do not dispute, that the D.C. Circuit, this court, other courts have held that in that case the promptness claim becomes moot. Here, and this is what Judge Heitens, I think, is getting at, and I was trying to explain is in that district court, what you have here is a set of three requests. You have a party who is, in fact, engaged in FOIA litigation. We cited, I added a footnote. This is an organization that is dedicated to ensuring that there is government oversight and that they are committed to the purposes of FOIA. That's why they do this. They are submitting FOIA requests. They submitted three of them. There's no question that the agency did not comply with the statutory deadline requirements in responding to those set of three requests. It is likely to occur in the future because Empower Oversight continues to submit requests. But you don't allege that. I'm sorry? You don't allege that. Where does it allege that you intend to make FOIA requests in the future? There's a reference to, I think it was the mission of the agency, the fact that we were seeking to, it was a point made in the district court. I don't know if it was made in the briefing or it was made at a hearing. That seems pretty important, whether you allege that you intend to do this in the future or not. In terms of your ability, I know this isn't like a Los Angeles versus Lyons standing type thing, but it's adjacent to it. Do you intend to do this in the future seems like a pretty important thing to allege or not allege. I agree, Your Honor. I think this argument was made. It was made in the district court. Right. But I think the point is that you just can't put the opposing party, whether it's the government or somebody else, on notice of a claim that's not in your complaint. It is in the complaint, Your Honor. We clearly asked for declaratory relief. We clearly brought this as a standalone claim. We cited to the statute itself. Where is it in your complaint that you intend to keep filing these FOIA requests? I thought that was what you were talking about. Oh, sorry. I don't know if it came up. There was three hearings. Right, but the hearing is not the complaint. Where does it allege that in the complaint? I don't have the complaint in front of me, Your Honor. I don't know if there's a specific instance where there's a line in there. I think it was describing what Empower Oversight does and is engaged in FOIA litigation. Well, even if it's engaged in FOIA litigation, it may not necessarily be engaged in FOIA litigation with the NIH. I mean, it could be some other agency, and I'm not sure how you could make a quasi-practice claim against NIH for something that you're going to do with the FBI or the DEA or somebody. Correct, Your Honor, and I think, to be quite frank, I think that the agency itself or the organization itself is a nonprofit. Frankly, given what it had to go through in this case with NIH, has not filed something against NIH, and I'm sure that it will. It continues to file FOIA requests. I don't know how often it does. I'd have to go look it up, but not all of them go to litigation. Obviously, some get resolved before that. This is an example where an agency did nothing for several months. It's a set of requests. It's a set of requests that were treated essentially the same. In other words, there was no action taken, so Power Oversight brought this claim. It's supported by the case law. It's supported by the case that Your Honor mentioned, the Judicial Watch case. There's cases in the Ninth Circuit that recognize this. This court should follow those cases. Well, we have a case, Coleman v. the DEA, that seems to say that the remedy for failure to timely respond is that the agency is barred from posing an exhaustion defense and that that's your remedy. That may be right or wrong, but that seems to be what that case is. We acknowledge that in our briefing. The DDC does the same thing. There's plenty of cases that say that. That says nothing about what happens once you get into court. No, it really does. It says the defendant had a defense that they might otherwise have had that they now don't have. That happens in court. It takes away a defense they would otherwise enjoy. It does not take away a district court's power under well-established case law to issue an injunction. This is the renegotiation board case out of the United States Supreme Court that tells you that the exclusive remedy is not just an injunction telling the agency that it has to produce documents. I mean, the court has discretion and can exercise that discretion to issue an injunction or a declaration consistent with the goals of the statute. And the goals of the statute are clear. Congress made FOIA to open up agency decision-making and to allow a requester to come into court and to seek that information. Can I have a question about the merits of this sort of underlying request, unless you have something you want to finish on this? No, Your Honor. Can I ask you about the NIH employees' contact information? Sure. How does that help the public understand the relevant sequence of events about why this data was removed, given people's email addresses? I'm not so sure that it's about the contact information, Your Honor. As to the redactions, Exemption 6 is at its zenith in terms of openness when it comes to personal information, and the statute uses the term similar files to medical and personnel files. So it has to be a similar file. What we're really concerned about is the names, and this is something the NIH acknowledges. There was one name of a requester that asked the NIH to withdraw information that was posted online. One of the Chinese researcher's name was released after fighting the government and a motion to seal. The other name was not. So it is important to get that name. Why? Because these are researchers. They're out there publishing. They are out there. This Zhao, I don't know the guy's name, but the researcher's name that was not redacted after we had a fight for this, he's got papers out there. It's important to figure out what was going on in China at the time of the Wuhan market or whether it was a lab, whatever was going on, right? But are these the researcher's names or are these the names of NIH employees? The NIH argues that the same privacy concerns apply to the researchers. Foreign citizens of China essentially have the same privacy interests as NIH employees. The curator, I think, is another example where we did fight and we did get that name redacted. To the extent that there are other names, the privacy interest in your name alone, I think it does go to what was going on inside the NIH, who knew, and who were they talking to. There's plenty of documents where they didn't redact the names. There's others where they did. So that's the argument on that. As to the searches, Your Honor, I just want to, there needs to be sufficient detail in the affidavits explaining what was going on. We are challenging the searches that the NIH did because the declarations submitted by Mr. Garcia-Molin don't provide the level of detail to explain why one search, which essentially has the same exact parameters. He just outlines the same thing that was conducted once and then conducted twice. As to the Congress request, that search, again, it lays out the parameters, yielded 17 pages that were produced to empower oversight. If you look at JA275, paragraph 45, he lays it out. Then it says in the next paragraph, and then 777 pages were produced. But, like, why? What changed? The parameters are the same. He searched the same executive office within the NIH. He applied the same search terms in response to this, and yet the second search yielded 777 pages. How can we possibly understand or challenge that search when we don't know, there's not enough sufficient detail in this record. You got the 777 pages? That's correct, Your Honor, yes. Well, you got what you asked for, didn't you? I have no idea what else is out there, Your Honor. The fruits of the search are not what makes the search adequate. It's the methodology. And there's a requirement that the affidavits that the government submits must be sufficiently detailed. It's not there. You have conclusory statements issued by the FOIA officer, essentially saying, here's what I did, here's what he yielded. That's not adequate, Your Honor. I'm sorry, but it is not adequate to cite to, it doesn't matter if it's 2,000 pages, 3,000 pages, it's not the adequate search is determined. It's by the way in which the agency went about this. And here on this record, we did argue below, and I'm arguing here that it was not sufficiently detailed. The Congressional FOIA request is a very good example of this. I've given you the citation. The government says that, you know, all that could have been done would be that it would be required to run the same searches. That's incorrect. What the government misses here is the opportunity for empowered oversight to make these arguments to the district court. And if all you have is a conclusory statement issued by a FOIA officer, you're depriving empowered oversight or any other FOIA requester of the ability to challenge that search. I have five minutes for rebuttals, so I'll wait for that. All right. Thank you very much. Ms. Loftus. Good morning, Your Honors, and may it please the Court. Megan Loftus, Assistant United States Attorney here on behalf of National Institutes of Health, or NIH. Your Honors, NIH respectfully requests that you affirm the entry of judgment in its favor on all three counts. I'll turn first to count one, which is the timeliness claim. This statute, I believe, as Your Honors alluded to a few moments ago, the statute already provides a solution for a requester if the agency misses that 20-day deadline. That's found in 552C1. If the agency fails to comply with that deadline, then the remedy is that there is no defense of administrative exhaustion that the agency may raise in federal court. Ms. Loftus, can I ask you about something you seem to work very hard to avoid saying directly in your brief? The NIH violated this rule, right? You don't actually come out and say it in your brief. You're like, they violated this rule, right? Correct. They did not meet the 20-day deadline. And it's not optional. This is not a NIH can – it sounds – let's posit I'm sympathetic, that like, oh, my God, this is really hard, and oh, my God, these deadlines are really short, and oh, my God, it's NIH at the pandemic, and so they might have excellent reasons. But under the statute, none of those things matter, right? The like, I've got other things to do is not an excuse to violate a statutory command? That's correct. Okay. So we have to decide this under the assumption that they violated the statute. That's correct. Okay. And as the statute also says, if the agency misses that 20-day deadline, again, the administrative exhaustion defense may not be raised. As Judge Agee pointed out, that's the Coleman case from this court. That's similar to what the D.C. Circuit found in the CRUVIE FEC case from 2013. Basically, in terms of the penalty, I use in quotes, is that the agency cannot rely on the administrative exhaustion requirement to keep cases from getting into court. But even if the district court could enter a declaratory judgment on the timeliness issue, which, again, we posit is not proper under the statute, that request is moot here. That's the Cornucopia case from the Seventh Circuit, which faced the exact same situation where the agency, I believe it was the Department of Agriculture, missed the 20-day deadline. At the time of adjudicating summary judgment, the agency or the requester was not asking for any additional documents, was not challenging any redactions. The Seventh Circuit found that issuing a declaratory judgment in that circumstance would not impact the requester in any way because the merits of the action were moot. The FOIA statute is designed to either enjoin an agency from improperly withholding documents or to compel the agency to produce documents that it hasn't already produced. Once that's done, there's no further relief on the merits that the court can award. At the time here that Count 1 was adjudicated, Empower's case on the merits was moot because Empower had received, as the district court held that the search was adequate, the redactions, with some exceptions not at issue here, were proper. The Cornucopia case does say that it might be relevant, the declaratory judgment for fees. However, on that record, declined to award on the timeliness issue because, again, the court found that the requester had not substantially prevailed. Additionally, as Your Honors noted, there's no allegation of a pattern or practice claim here, and I would point the court to JA 19, which is Count 1, which lists the relief that Empower is seeking under Count 1, and then JA 22 to 23, which is a specific alphabetized list of the relief sought. There's nowhere in there that there's an allegation that Empower will, again, seek to make a FOIA request of NIH. What about taking all the allegations of the complaint together, that the agency repeatedly failed to meet the deadlines, like one after the other, and failed by a pretty wide margin to meet them? Why could that not be viewed as a pattern and practice, even if the magic words are not in the complaint?  In this case, there were three requests at issue. In the pattern or practice cases, which are described in our briefs, I think the Secret Service case, which I apologize. I believe it's a Judicial Watch case, but there are a lot of Judicial Watch and a lot of CRU cases, so it's sometimes hard to distinguish. But in that case, there were, I believe, over six lawsuits. There were 29 different FOIA requests where the agency had missed, and there was a pattern of the Secret Service for pretty benign requests of just looking for receipts and reimbursements of the Secret Service, not responding, not doing anything until a lawsuit was filed. The lawsuit was filed, and documents were then produced. So I think for a pattern or practice claim to lay, even if it were properly alleged in this complaint, there would need to be a far more, frankly, egregious list of requests that were ignored. I know my opposing counsel mentioned that NIH did nothing until this lawsuit was filed. Frankly, I don't think that's supported in the record because, as we highlighted in our briefs, Empower never filed a motion for attorney's fees, and so we did not have a record of what the agency was doing prior to the complaint being filed because, as this Court is aware, simply filing the complaint and the documents coming thereafter is not enough under the statute to demonstrate that a requester substantially prevailed. Mr. Bieler also argues that the agency's explanation of their searches or what they were doing to look for the documents was inadequate. What's your response to that? Your Honor, I disagree with that, as you might have guessed. The standard is looking at the four corners of the request and figuring out where in the agency is most likely to have responsive records. I believe Mr. Bieler spoke specifically about the Congressional requests. I'd like to note that in between the first and second requests, the first search on that request, NIH searched the Executive Secretariat, which is a small office within the Office of the Director at NIH that every Congressional correspondence is funneled to. On the second search, and in fact this is at J274, paragraph 44, NIH actually went and expanded its search to a second office, the Office of Legislative Policy and Analysis. That then resulted in the additional 777 records, I believe, or pages that were discussed. So it is not the case that NIH did not explain where it was looking or why it was looking. In fact, there were some intermediate proceedings before the district court. The district court had made some suggestions, if you will, as to ways that NIH could improve its search, and the agency took that to heart when it did that. Additionally, Empower had identified, I believe, four custodians that it would like the agency to search. The agency did that. Outside of those four custodians, there's no record, and Empower doesn't posit that it asked the agency for anything additional. The actual unredacted response letter to the Senators was produced? The redacted. I thought it was unredacted. Oh, I'm sorry, yes. The actual response letter, yes, that was produced. I mistook your honor for asking about the draft responses, which are at J431. In preparing the responses to that draft, one of the NIH employees embedded the draft responses right in the letter so that somebody reviewing what NIH was going to say could look at the request and look at the draft response. I know Empower takes issue with the redactions there, claiming that it's purely factual information. It should not have been redacted under B-5. Simply because the draft answer may be a combination of facts doesn't remove it from the deliberative process privilege. The Supreme Court's decision in U.S. Fish and Wildlife and the Dudman case from D.C. Circuit read together instruct that the particular combination of facts in a draft is a product of editorial judgment, and the real chilling effect, which is what Dudman talks about, is not in the disclosure of the facts themselves, but that the agency as an institution made changes in a draft at some point. So we also have NIH put together a lengthy Vaughn Index, which detailed every explanation for every single redaction in the 300 pages, or excuse me, 300 redactions that were done. Empower never mentions that index, either before this court or below, but the thrust of that document is that it was a draft that was being prepared. It looks like it's almost a final decision, but it was just for ease of reference for the reviewers. I did want to go back, Your Honors, just briefly to the timeliness claim. Mr. Buelert mentioned the Our Children's Earth Foundation case, which is a district court case from the Northern District of California. That case had two agency defendants. One was from the Department of Interior, the Fish and Wildlife Service. The other was from the Department of Commerce, the Fisheries Service. The district court considered whether it should enter a declaratory judgment on violating the 20-day statutory deadline, and it actually came out separately as to the two defendants. I think what was motivating the decision there, if you have a chance to look, is that the Fisheries Service had a pattern or practice with respect to the particular requester of not answering FOIA requests in a timely manner. There were many requests. There was a significant delay in receiving documents, many more months than at issue here. The district court first said, as a matter of statutory interpretation, it's correct that the FOIA statute itself, the remedy for the 20-day violation, is this waiver for the administrative exhaustion defense. Sitting in equity, the district court found that it could offer additional relief in the form of this declaratory judgment because that would provide some guidance going forward to the Fisheries Service and clarify the relationship between the two parties who are likely to be engaged in FOIA disputes again. The district court did not issue a declaratory judgment as to the Fish and Wildlife Service because even though they had also missed that 20-day deadline, it was because the Fisheries Service had referred out documents for Fish and Wildlife to say, yes, you can release or no, you can't, that even though they had missed that deadline, there wasn't this pattern or practice of delayed responses with Fish and Wildlife Service and there was no allegation that the particular requester at issue was going to, again, be requesting from Fish and Wildlife Service. I'd also note in the briefs, EMPOWER relies on a judicial watch case from the D.C. Circuit in 2018, a concurrence, but that case, for the proposition that this 20-day deadline has some kind of separate enforcement mechanism that what's already in the statute, the concurrence actually did not reach the question of whether the 20-day deadline had a stand-alone violation provision. And just briefly, again, on the timeliness issue, the renegotiation board case that Mr. Bielert cited, the question presented there was whether the district court had jurisdiction under the FOIA to enjoin the renegotiation board process until the FOIA claim was resolved. And it actually didn't decide that particular issue. It held on the exhaustion ground. So NIH does not believe that that case stands for as broad a proposition as Mr. Bielert suggested does. Finally, as to the B6 redactions, the personal privacy redactions, I would note that the cases that we cite in our brief describe the public interest and what's required and what especially in light of a privacy interest here by both a lower-level NIH employee and the Chinese researcher, that even though there is a public interest in learning about how the pandemic originated and what the government knows about that and what the government's doing, I don't believe that Empower has articulated how learning the names of, first, the NIH employee would add to that, and second, the name of the Chinese researcher would add to that. I think that the logic of the Pin Son case, where it was discussing foreign governments, I believe it was a 7C case, but the logic is similar in that the requester wanted to know the identities of foreign criminal investigators who were assisting the FBI, and the district court held that it's not so much the individuals themselves, it's that a foreign government is assisting in criminal investigations in the United States. Well, I don't know when it was articulated first, but today your colleague said, one of the reasons we'd like to know the name of the Chinese researcher is I'd like to know if that individual is also publishing papers that say things about the origins of the pandemic, like super duper definitely not this thing, right? So that's something you articulated today about why they would want to know the name of that person. Right, Your Honor. And again, I'd highlight it was something I articulated today, so not something we've had the opportunity to discuss both before the district court and briefed before this court. But at least in principle, that seems plausible, right? Like I'd like to know if the person who submitted this data and then asked to take this data back was then publishing articles about this exact same topic that might shed light on why they would submit and then withdraw data. Sure, that is understandable. I'd also note, though, the Lauer Declaration that we have in the record, and there was reference below to public news reports about researchers in China, in particular, for their speaking out about COVID and penalties that they might face by their government for doing so, particularly around this question of how the pandemic started. So I would say, again, I'm completely speculating, so for what that's worth, I would say it's probably unlikely that the researcher is out there publishing that kind of material, but even if he or she was, I think the NIH is rightly concerned about the type of threats that individuals kind of associated with this question are facing, that it's a very real threat for the agency that they're very concerned about. So if Empower had made that specific argument that they made today in their complaint in the district court, would your response be different? No, I don't believe so. I think we still would have asserted that there is substantial privacy interest here, that the public interest in learning about the origins of the pandemic is already satisfied when Empower holds the information that it's a Chinese researcher affiliated with Wuhan University, and really the question of the public interest under Exemption 6, as this court held in Solers, is the government, for an individual to understand what their government is up to, and so yes, while the question of what a researcher may or may not be publishing, that could be an important question to decide, the inquiry under Exemption 6 is how is this going to help further what the public knows about what its government is doing, is it fulfilling its statutory duty, and we would likely have argued that that purpose doesn't fulfill what Exemption 6 is, how Exemption 6 defines the public interest. Unless your honors have any further questions, NIH respectfully requests that you affirm the entry of judgment in its favor. All right, thank you, Ms. Loftus. Mr. Bieler, you've got some time remaining. Thank you, Your Honor. I want to start sort of where we just picked off, or ended with, this notion that we did not address the Chinese researcher's names. This was addressed at the hearing. This was addressed in the fight over sealing the names, and Power Oversight has always maintained that those names should not be redacted. There's a footnote in our, I think, opening brief where we cite to another case. Are you putting the NIH employees and the Chinese researcher in the same basket? I'm not necessarily. I think the case for the Chinese researcher is even stronger. These are, in fact, public people that are teaching at Wuhan University or writing papers. The one researcher named who was unredacted, in fact, has published papers addressing COVID-19, and his research ties directly to the information that Empower Oversight seeks. We cited specifically the concerns raised by the senators. In this exact context, that the government, that the people have a right to know what their government is up to and what their government knew, FOIA establishes a very strong preference for openness. Here you have in the NIH's brief citing to misinformation. This is an agency deciding what information goes out to the public. Well, if you want to fight misinformation, you follow FOIA and allow the information to get out so that people aren't looking behind black boxes coming up with conspiracy theories. That's not what's going on here. This name of the Chinese researcher should have been redacted. It was done in other FOIA litigation. It should have been done here. As to the Vaughn Index, You mean it should have been unredacted. It should have been unredacted. It should not have been put behind a B6 black box. As to B5, the government misunderstands the duty to segregate factual information. This is, again, an argument that Empower Oversight made throughout this litigation. There is an obligation to segregate. You must go through and have factual information not be put behind a massive B5 box. We cited, in the record, plenty of B5 boxes. It strains credulity to suggest that the answer to a senator's question, specifically asking for facts, that there's not a fact that can be not redacted. We made this argument below. We stand by it here. As to the declaratory judgment, the Cornucopia case, you heard the government counsel. She already acknowledged that they did not seek to challenge the scope of the search, and they did not seek to challenge exemptions in the case. Very different from this case. I pointed this out in her brief as well. There was a judicial role to still be performed, and it was, in fact, performed. There were three hearings. There were several orders. The court went through and looked at the searches and actually forced the government to unredact some of the things that it redacted. It's certainly not true that this case is anything like Cornucopia. Each case turns on its unique circumstances. Our point is that lower courts, district courts, have the authority to issue injunctions and to issue declaratory judgments. FOIA didn't change that. The court can exercise its discretion to determine when that's appropriate. This is one of those cases. Whether I use the magic language pattern or practice or not, the same effect, it's exactly the same thing that's going on. You have a set of requests. You have an agency that admittedly did not follow the mandatory language, shall, that Congress put into the statute. The agency may not like that. Fine, go to Congress. Get them to change it. You don't like the deadline? Great. Go tell Congress to change it. That's not the way that it works. It's a set of requests. The agency admits that it didn't follow the deadline requirements, and there has to be some sort of guidance given to the NIH going forward. That's what a declaratory judgment does. And this record is exactly one of those cases. The government came in in its opening brief for summary judgment, and I encourage you to read this. They didn't even address Claim 1. They dropped a footnote. The footnote says statutory deadlines are irrelevant. Well, they're not. I'm sorry to say that. The footnote says what? That statutory deadlines are irrelevant is the term that the government uses. Open the opening brief on summary judgment that was filed below by the NIH. They say don't even address Claim 1. Focus only on the search. Focus only on the exemptions. Don't even address the timeliness requirement because it's irrelevant. That's not true. It's not even true on the cases they cite, which is something that we distinguished here and we distinguished below. So I do think this is one of those extraordinary cases where the district court could have and, in fact, should have issued a declaratory judgment. Frankly, this court's guidance is necessary. Lower courts, they're looking to the DDC. There's plenty of cases in DDC where they get things wrong. Lower courts need guidance from this court explaining the powers that they have and when they are allowed to exercise those. I ask that you reverse the judgment for one of the three reasons that we gave in our briefing. Thank you. All right. Thank you very much. The court appreciates the arguments made by counsel today, and I'm going to ask the clerk if she'll adjourn court until tomorrow, and then we'll come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: G. Steven Agee, Stephanie D. Thacker, Toby J. Heytens